FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ NOV 05 2017 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
DESLY INTERNATIONAL CORPORATION;
MARAT NOVIKOV; OLGA NOVIKOV; ANDREY
NOVIKOV,

       Plaintiffs/Counter-Defendants,

   -against-

OTKRYTOE AKTSIONERNOE OBSHCHESTVO
"SPARTAK" a/k/a SOVMESTNOE
PREDPRIYATIE OTKRYTOE and a/k/a
AKTSIONERNOE OBSHCHESTVO "SPARTAK";
EURO IMPORT DISTRIBUTIONS INC.; EURO
IMPORT BEL LLC; EURO IMPORT INC.,

       Defendants/Counter-Plaintiffs.
------------------------------------------------------------------ x

MEMORANDUM DECISION &
ORDER
13-CV-2303 (ENV) (LB)

VITALIANO, D.J.

  With overtones of international intrigue, this is but a case about the right to market certain confectionary goods in the United States. In the last act of this litigation drama, trial to the Court was had on a counterclaim against plaintiff Desly International Corporation ("Desly") filed by defendant Otkrytoe Aktsionernoe Obshchestvo "Spartak" ("Spartak"). At an earlier stage in the case (almost a year ago), it had been found that Spartak was the rightful owner of the Spartak marks that were at dispute in the original trademark and contract action brought by Desly against Spartak.[1] *See Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo "Spartak"*, 13-CV-2303(ENV)(LB), 2016 WL 4532113 (E.D.N.Y. Aug. 29, 2016) ("*Desly I*"). Damages

---

[1] There are other parties named on each side of the central dispute but each is affiliated with a main combatant in the litigation. For ease of discussion, reference will, for the most part, be made only to these two principal litigants.

1

and a few other lingering counterclaims would be and were the subject of the trial. *Id.* at *1 n.2.[2]

The demand for a jury having been dropped the day before, trial to the Court began on June 26, 2017 and concluded the following day. The spotlight was on Spartak's claim that it was entitled to the profits earned by Desly resulting from Desly's sale of certain gingerbread and dried bread products (the "accused products"), which were sold in packaging bearing Spartak's trademark labeled packaging, though not manufactured by Spartak. Post-trial briefs were submitted by both sides. *See* Dkt. No. 186 ("Desly Br."); Dkt. No. 186-1; Dkt. No. 188 ("Spartak Br."); Dkt. No. 189 ("Desly Reply"); Dkt. No. 190; Dkt. No. 191 ("Spartak Reply"). Having considered the testimony, the exhibits received in evidence, and the arguments of counsel, this Memorandum Decision and Order, pursuant to Federal Rule of Civil Procedure 52, constitutes the Court's findings of fact and conclusions of law.

Findings of Fact

Since the late 1920s, Spartak, a Belarusian joint venture open-type joint stock company, has specialized in the production, manufacture, distribution, and sale of chocolate and

---

[2] The litigation posture of the case did not remain static following summary judgment. Without repeating the detail memorialized in the intervening court appearances and docket entries, in the roughly 10-month period following the entry of partial summary judgment, Spartak withdrew certain of its damages claims and theories. *See* Dkt. No. 146 at 6-7; Dkt. No. 160 at 2 n.2, 7; Dkt. No. 173 at 6; Dkt. No. 176 at 1; 6/23/17 Dkt. Order; *see also* 4/28/17 Pre-trial Conference Transcript ("Conf. Tr.") at 5-7. Indeed, in the lead up to the trial, Spartak's damages assessment changed almost daily. At times, the Court was left to wonder whether there was any "earthly way of knowing which direction they are going." *See* WILLY WONKA & THE CHOCOLATE FACTORY (Paramount Pictures 1971). Also dismissed, upon Spartak's representation that it would not be presenting proof of causally-related damages, was Spartak's claim for tortious interference. Conf. Tr. at 5; Dkt. No. 160 at 2 n.2. Additionally, Euro Import Distributions Inc., Euro Import Bel LLC, and Euro Import Inc. (collectively, "Euro"), successors to Desly, filed a stipulation of dismissal on the eve of trial as to all claims and counterclaims between Euro and the Desly litigants. When Euro bowed out, just about any hope Spartak had of proving tortious interference with business relations, specifically, any new distribution agreement Spartak may have had with Euro, bowed out with it. *See* Dkt. No. 159.

confectionary goods, according to Marat Novikov ("Novikov"). Trial Transcript ("Tr.") at 20. Novikov, a counterclaim defendant,[3] the Court finds, provided entirely credible testimony about the relationships among the parties and their historical context. He was born in Belarus in 1949 and spent approximately 15 years in the Belarussian supermarket industry. *Id.* at 69-70. After leaving Belarus for the United States in 1989, around the time of the collapse of the Soviet Union—which would spell great change for former Soviet satellite states like Belarus—Novikov returned to his native country a few years later to pursue a business venture relating to the importation of food products into Belarus. *Id.* at 70-71. This entrepreneurship eventually led to Novikov's involvement with Spartak. In fact, Novikov would be asked to sit on Spartak's supervisory board. As a result, he would meet and work with the then general director of Spartak, Alesia Samsonava. *Id.* at 73, 79, 107-09; *see also* Dkt. No. 32 ¶ 28. All in all, Novikov credibly testified that he spent a significant amount of time in Belarus at the Spartak factory and became intimately familiar with Spartak's machinery, manufacturing processes, and production line. Tr. at 75-76, 80. With the assistance of his son and daughter, Novikov set out to build on his relationship with Spartak, to expand Spartak's business through the creation of a distribution network in his adopted American homeland for imported Spartak confectionary and baked good products. That new distribution company would be located in Brooklyn. The new company, of course, was Desly. *Id.* at 20, 32; DTX 63.[4] Desly identifies itself as a wholesaler for confectionary goods in targeting a Russian-speaking market. Tr. at 28-29.

---

[3] At the close of Spartak's case, judgment as a matter of law was granted in favor of the individual counterclaim defendants, Marat Novikov, Olga Novikov, and Andrey Novikov, on their Rule 50 motions. Tr. at 55-57.

[4] References to "PTX" and "DTX" denote, respectively, Spartak's trial exhibits and Desly's trial exhibits.

3

On September 1, 2001, Spartak entered into a non-exclusive supply agreement with Desly, under which Desly was authorized and did begin distributing Spartak's confectionary goods in the United States. On July 21, 2006, Spartak and Desly extended that business relationship, entering into a 25-year exclusive distributorship agreement (the "exclusive agreement"). *See* Exclusive Agreement, DTX 7; Tr. at 111. The latter agreement granted Desly the exclusive American distribution right to confectionary goods manufactured by Spartak. Exclusive Agreement § 2; Tr. at 32. In 2012, however, Spartak advised Desly of its discovery that Desly had registered the Spartak marks with the United States Patent and Trademark Office ("USPTO"), three years prior, in breach of the exclusive agreement. Exclusive Agreement §§ 2.4, 8.2; *Desly I* at *2. Beyond that breach, there is no dispute that both sides acted in general conformity with the contract. Desly, for instance, made payments to Spartak for the Spartak goods that it purchased from Spartak and sold in the United States. Tr. at 34-37, 42; DTX 42-47.

Desly's business, though, was not limited to the sale of Spartak-manufactured goods. Beginning in or around 2011, Desly also purchased certain bread-based products (the accused products) from the Lithuanian company, Javeine, and the Belarussian company, Minskhlebprom. Tr. at 25, 27, 38, 85. The accused products were packaged and then shipped from Eastern Europe to Desly in Brooklyn, occasionally in the same containers as Spartak products. *Id.* at 38-39. Spartak did not make or sell these or any similar type products, but, nevertheless, Desly sold these goods with Spartak marks and packaging.[5] And, it sold the accused products only in the United States. *Id.*

By the time of Spartak's complaint about it, Desly's side business should not have come

---

[5] Not only was Spartak not engaged in these product lines, it did not even possess the manufacturing equipment to make such products. *Id.* at 51, 77, 80-81, 86, 114-15.

4

as a surprise to Spartak. As a member of Spartak's supervisory board, in or around 2011, Marat Novikov brought the accused products, actually bearing the Spartak label, to a board meeting and presented them to the other Spartak board members. *Id.* at 83-84. In fact, the general director of Spartak from 2008 to 2012, Alesia Samsonava, testified at trial that she knew that Desly was distributing such non-Spartak products in the United States under Spartak's mark. *Id.* at 118, 120. Put differently, despite the open and unhidden nature of Desly's side business, until it claimed breach, no representative of Spartak ever advised anyone at Desly not to sell the accused products or complained to Desly about such sale. *Id.* at 118. At the same time, however, Desly acknowledged that it did not receive explicit permission from Spartak to sell the accused products with Spartak's marks on the packaging. *Id.* at 117; Dkt. No. 187-3 at 164-65.

There is, moreover, certainly no genuine dispute about Desly using the Spartak mark on the packaging of its non-Spartak produced goods. The packaging, reflected in the trial photo exhibits below, confirm that, during the relevant time, the gingerbread cookies, sold as part of the Desly's side business, displayed "Desly International Corp." in large blue and gold font and, then, "Spartak" in white and gold lettering on the clear wrapping:



*See* PTX 10 at DES000387-389; Dkt. No. 81-36; Tr. at 21-22, 25, 41. Similarly, photos of the dried bagel products show the words "Desly International Corp." in blue and gold lettering on

the front label, with the word "Spartak" in gold and white lettering on the clear, cellophane-like wrapping. PTX 10 at DES000391-92.

 

Simply, there is no quarrel on this trial record that the Desly name and logo, in addition to Spartak's name, appeared on all products that Desly purchased from Javeine and Minskhlebprom. Tr. at 41. The accused products, since they were openly sold, appeared in a showcase in Desly's warehouse, where Spartak employees visited from time to time. *Id.* at 39, 53, 65. Desly also advertised the accused products on a website that it operated at www.spartakusa.com. PTX 155 (depicting sale of "Sushki" – dried bread products).[6]

Desly stopped selling the gingerbread cookies and dried bagel products in packaging that bore the Spartak name in 2014. Tr. at 27, 48. Its records reflect that it profited in the amount of $572,578.81 from the sale of these accused products, which covered a period from 2011 to the sales halt in 2014, *see* PTX 209, 210, 211. Spartak now seeks to disgorge Desly of these profits. *See* Spartak Br. at 10, 12. During this same period, Desly, of course, continued to sell the Spartak products it had acquired from Spartak under the exclusive agreement. Though it remains hotly contested by Spartak, as the Court previously determined, Desly had a plain right to

---

[6] By all accounts, the website was disabled a few weeks or months following this Court's summary judgment determinations. Conf. Tr. at 41-45.

distribute these products for up to two years after Spartak terminated that agreement, *see* Exclusive Agreement § 11.3, which it did terminate because Desly had unlawfully appropriated the Spartak mark when it registered it with USPTO. *See Desly I* at *3.

The trial provided ample factual context about a good deal gone sour. Novikov was removed from the Spartak supervisory board in 2012, at some point after Belarusian President Alexander Lukashenko essentially seized control of the Spartak factory. Tr. at 82-83, 110; *see also Desly I* at *4. Samsonova was also replaced that same year. Tr. at 110. Indeed, there is little, if anything, in the record to rebut the torrent of testimony from Novikov and Samsonova that, in sum and substance, Lukashenko had "Putinized" Spartak, purged its corporate structure, turned it over to an oligarch and took steps to disrupt its existing business relationships. *See, e.g.,* Tr. at 110. With that handwriting on the wall, it made sense that Desly had to go. Notwithstanding the hand in glove relationship that Desly and Spartak had had in prior years, the new broom would sweep clean. Desly's misconduct in registering on its own the Spartak mark in the United States provided the new Spartak team with the contractual right to terminate the exclusive agreement. The point of trial, essentially, was to determine what damages, if any, were owed to Spartak on its counterclaim as a result of Desly's misconduct under the Lanham Act and/or under the contract.

## Conclusions of Law

For all practical purposes, litigation of Spartak's counterclaim was bifurcated, with competing claims for the right to the Spartak mark in the United States resolved at summary judgment. *See Desly I*. More specifically, Spartak prevailed on its false designation of origin claim in contravention of § 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a). Success on this sort of claim entitles a plaintiff, "subject to the principles of equity, to recover (1) defendant's

profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Spartak, as a result, seeks an award based upon the profits generated by Desly's § 43(a) violation. *See* Spartak Br. at 8; Conf. Tr. at 49.

Yet, § 43(a) is a mere gateway to determining the propriety of our award of damages. For example, § 1117(a) provides helpful guidance regarding the burdens of proof with respect to any assessment of relevant profits. Not surprisingly, it is the plaintiff's burden to prove a defendant's offending sales. The burden then shifts to that defendant to prove deductible costs and expenses included in the course of making the offending sales. *Id.* In the event of a finding that recovery based upon profits is "either inadequate or excessive," the trial court also has discretion to enter judgment in an amount found to be just, according to the particular circumstances of the case. 15 U.S.C. § 1117(a). There is a further caution, too, that recovery for a violation of the Lanham Act "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

I. An Award of Profits

Notwithstanding proof of a Lanham Act violation, an award of a defendant's profits is not automatic. In fact, in the Second Circuit, there are only three circumstances in which an accounting for profits is available: if the defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if an accounting is necessary to deter a willful infringer from doing so again. *Burndy Corp. v. Teledyne Industries, Inc.,* 748 F.2d 767, 772 (2d Cir. 1984). As a foundational matter then, it is imperative that a claimant identify the precise ground or theory that would justify an award of profits. *See George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1537 (2d Cir. 1992). As Spartak has advanced absolutely no evidence that it has sustained any damages as a result of Desly's distribution of the accused products, any award of profits would

have to be justified either by Desly's unjust enrichment or a need to deter repetition of the misconduct.

A. *Unjust Enrichment*

As the seminal *Basch* case establishes, "a defendant becomes accountable for its profits[,]" under a theory of unjust enrichment, "when the plaintiff can show that, were it not for defendant's infringement, the defendant's sales would otherwise have gone to the plaintiff." 968 F.2d at 1538; *see also Burndy Corp.*, 748 F.2d at 770, 773. This approach, too, is a dry hole for Spartak. It has produced not a scintilla of evidence even hinting that Desly's use of the mark on the accused products (gingerbread cookies and dried bagels) caused Spartak any monetary or other damage based on diverted sales. *See Basch*, 968 F.2d at 1541 (noting that profits should not be awarded when "there is nothing to suggest that [defendants'] sales were at [plaintiff]'s expense" (internal quotations and citations omitted)).

Factually, Desly introduced documents reflecting the payments made *to* Spartak *by* Desly from 2007 to 2012, indicating that not only did Spartak continue to have a presence in the Russian confectionary products American market during Desly's distribution of those products, but also that sales did not experience a decrease in the sale of genuine Spartak goods, even though Desly engaged in its side business. Tr. at 34-37, 42; DTX 42-47. In fact, payments from Desly to Spartak for genuine Spartak goods actually increased during this time from $936,331.36 in 2011 to $1,239,056.06 in 2012. DTX 46, 47. Far more significantly still, Spartak did not even possess the equipment that would allow it to manufacture gingerbread cookies or bread products during the relevant time period. Tr. at 51. By all accounts, the sale of the accused products had no demonstrable negative impact on Spartak's business. There is no proof that Spartak lost any sales to Desly. Indeed, the proof is compelling that the sale of the accused

products, if anything, bolstered the sale of Spartak's genuine goods, strongly suggesting that Desly's side business sales advanced Spartak's presence in the American market. Spartak's bald assertion that the accused products "likely competed with and cannibalized sales of Spartak's genuine products", while "the products would have sat side-by-side on the store shelves", Spartak Reply at 3, is simply not supported by the record.

Additionally, a profits award, "premised upon a theory of unjust enrichment, requires a showing of actual consumer confusion—or at least proof of deceptive intent so as to raise the rebuttable presumption of consumer confusion." *Basch*, 968 F.2d at 1538. Finally, that there is the availability of such a presumption provides great insight in understanding the concept of unjust enrichment in a Lanham Act context. These precedents reflect the understanding that "consumer confusion" is a motivating principle behind an award of profits under a theory of unjust enrichment, even if deceptive intent is being used as a proxy for such confusion.

Following this guidance, the evidentiary bucket with respect to consumer confusion is absolutely empty. There is not even the slightest indication of "actual" consumer confusion in this market by either a retailer or purchaser.[7] While the Court made the requisite finding, in the liability phase, that there was a "likelihood of confusion" and noted that some sort of "consumer confusion [was] inevitable", there was no finding as to "actual confusion." *Desly I* at *9. At the liability phase, moreover, it was not yet clear whether Spartak would offer evidence that Desly had sold in the American market with the Spartak mark any products produced by another manufacturer of the type manufactured and sold by Spartak. In any event, as Spartak should have well understood, the Court's partial summary judgment determination did not alter its

---

[7] Indeed, prior to trial, Spartak indicated that then-co-counter-plaintiff Euro would offer evidence at trial of actual marketplace confusion. Conf. Tr. at 7-8. No such evidence was introduced at trial.

obligation to show actual confusion. *See* Dkt. No. 79 at 8. Relatedly, as will be discussed *infra*, Spartak has not shown that Desly operated with deceptive intent in selling the accused products, which is a prerequisite to triggering application of the rebuttable presumption of consumer confusion. In short, neither proof nor presumption sustains this contention.

B. *Deterrence*

A successful Lanham Act claimant already has one leg up in a deterrence based theory of damages, since there has already been one proven violation and concern for a reoccurrence is natural. Of course, the damages inquiry does not necessarily end there, though "a court may award a [Lanham Act] defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark," when based on this theory. *Basch*, 968 F.2d at 1539. At the same time, this policy objective is best understood in the recognition that "[t]he rationale underlying this holding is not compensatory in nature, but rather seeks to protect the public at large[,] [and] [b]y awarding the profits of a bad faith infringer to the rightful owner of a mark, [a court] promote[s] the secondary effect of deterring public fraud regarding the source and quality of consumer goods and services." *Id.*

Not even Spartak suggests that Desly's conduct was like that of a serial infringer, who needs to be stopped from infringing again. Certainly, no evidence was proffered that Desly was/is a "commercial racketeer" or has "taken up trademark infringement as its principal line of business."[8] *Monsanto Chem. Co. v. Perfect Fit Prod. Mfg. Co.*, 349 F.2d 389, 396 (2d Cir. 1965). In fact, by all accounts, Desly's side business was born out of its legitimate commercial

---

[8] Spartak argues in its reply brief, without citation, that Desly also attempted to misappropriate the trademark rights of another Belarusian confectionary maker by the name of "Kommunarka." Spartak Reply at 7. The Court has searched the trial record and finds no admissible evidence to support such a finding of fact.

11

engagement with Spartak and was nurtured by its understanding that the side business was not opposed by Spartak and that the usage of the two labels would be either neutral or commercially beneficial to Spartak. Certainly, notwithstanding that Desly's sale of the accused products associated Spartak with products it did not make or distribute, there is absolutely no evidence that Desly intended to cause Spartak any harm—nor is there a shred of evidence that such conduct did. It is equally true, moreover, that there is also no basis for a finding that Desly continues, or intends, to display "Spartak" on the accused products, which factors into the need for deterrence that is required for recovery on this theory. *See Burndy Corp.*, 748 F.2d at 773. Additionally, as will be explored in greater detail below, Desly's actions do not warrant a finding that placement of the Spartak mark on the packaging for the accused products constituted willful conduct. *See El Greco Leather Prod. Co. v. Shoe World, Inc.*, 726 F. Supp. 25, 30 (E.D.N.Y. 1989) ("This court has already laid to rest the question of a deterrence award in this case by concluding that the infringement was . . . not willful."). For these reasons, an award of profits premised on a theory of deterrence is not warranted.

II. Willfulness

It is important to emphasize that even had Spartak marshalled other evidence supporting its Lanham Act claim, it would still stumble on its inability to proffer evidence to establish willfulness on Desly's part. That is important because "under any [of the three theories], a finding of defendant's willful deceptiveness is a prerequisite for awarding profits." *Basch*, 968 F.2d at 1537. Though it is true that "continuing viability" of the willfulness requirement as articulated in *Basch* following amendments to § 1125 of the Lanham Act is an open question in this circuit and courts have reached different conclusions as to whether a willfulness prerequisite remains. *Pedinol Pharmacal, Inc. v. Rising Pharm., Inc.*, 570 F. Supp. 2d 498, 502 (E.D.N.Y.

2008) (noting the existing disagreement among courts but finding that willfulness remains a requirement for recovery of damages); *cf. Cartier v. Aaron Faber, Inc.*, 512 F.Supp.2d 165, 173 (S.D.N.Y.2007) (holding that willfulness is no longer required for recovery after 1999 amendment to Lanham Act).

The question is somewhat academic here, since both parties agree that willfulness is a prerequisite for damages. *See* Spartak Br. at 9; Dkt. No. 156-2 at 2; Desly Br. at 4. The Court, however, reviewed the statutory history and the motivating policies behind awarding profits to a successful plaintiff. The Court finds itself in agreement with the parties and the other district courts in this Circuit that have concluded that willfulness remains a prerequisite for an accounting of profits. *See, e.g., Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 12-CV-7992 (KBF), 2014 WL 185222, at *6 (S.D.N.Y. Jan. 16, 2014) ("[T]his Court agrees that willful deception or bad faith continues to be a prerequisite to an award of profits or damages . . . until the Second Circuit instructs otherwise." (internal quotations and citations omitted)).

Analytically, in a Lanham Act case, "[t]he standard for willfulness is 'whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility.'" *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 393 (S.D.N.Y. 2010) (citation omitted); *see also Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d Cir. 1999). "If, however, the defendant believed in good faith that his use of the mark did not constitute infringement, and is able to support that belief with more than conclusory allegations, then the court may find that defendant's infringement was not willful." *Rodgers v. Wright*, 04-CV-01149 (RJH), 2011 WL 722772, at *2 (S.D.N.Y. Mar. 1, 2011). "Even deliberate copying of a mark does not necessarily indicate that the defendant acted in bad faith, if there was no intent to deceive." *Guthrie Healthcare Sys.*, 2014 WL 185222, at *7; *see also Info.*

*Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 57 (S.D.N.Y. 2005) (finding that "[s]ince [plaintiff] ha[d] presented no evidence of any injury resulting from the [d]efendants' actions and ha[d] not shown any willful infringement on the part of the [d]efendants, it [was] not entitled to" an accounting of profits).

It is apparent that Spartak's only colorable assertions of willfulness are that (i) Desly registered its marks with USPTO in violation of the explicit terms of the exclusive agreement, *see* Spartak Br. at 1-3, and (ii) sold the accused products with Spartak's mark, falsely suggesting that Spartak was the source of these products and was not otherwise in compliance with the exclusive agreement, *see id.* at 4-6. Neither Spartak nor the record suggests anything else that would even vaguely support a willfulness finding.

Taking them separately, Desly's registration of the Spartak mark and logo with USPTO was certainly an intentional act; it breached the exclusive agreement between the parties and was wrongful and willful. But, though entitling Spartak to injunctive relief, this willful conduct by Desly does not automatically entitle Spartak to Desly's profits. The willfulness at issue must have at least some connection to the alleged market conduct violating the Lanham Act. *See Basch*, 968 F.2d at 1541 (noting that the relevant question is whether there was evidence regarding "bad faith infringement"). Surely, if this were not the case, having actual consumer confusion as one benchmark for obtaining profits makes little sense. Desly's fraudulent registration of Spartak's marks with the USPTO, alone, does not establish that Desly had knowledge that this conduct "represented infringement or perhaps recklessly disregarded the possibility [of infringement],'" *Fendi Adele S.R.L.*, 696 F. Supp. 2d at 393, having a negative impact on Spartak's business in the American marketplace.

As for Desly's distribution and sale of the accused products with the logo on them,

Spartak appears to contend that willfulness can be established by Desly's alleged breach of the following provisions of the exclusive agreement: Section 2.1, which provides in part that "[Desly] shall only distribute the Products to Customers in the packaging provided by [Spartak];" Section 7.4, which provides in pertinent part that "[Desly] may not make any contacts or comments on behalf of [Spartak] nor make any warranties or other representations regarding the Products other than those authorized [in the exclusive agreement] or by [Spartak] in a separate writing;" Section 8.3, providing that "[Desly] agrees to notify owner immediately of any circumstances [Desly] has knowledge of relating to any unauthorized use or manufacturing of the Products by any person or entity not authorized to do so[,]" and that "[Desly] allows [Spartak], at [Spartak's] option and under [Spartak's] control any discretion, any legal action necessary to prevent or stop the unauthorized use of manufacturing of the products by any third person or entity who or which has obtained the Products due, in substantial part, to [Desly's] chain of distribution;" and, Section 15.4, providing that the exclusive agreement "shall not be construed as authority for either party to act for the other party in any agency or other capacity or to make commitments of any kind for the account of on behalf of the other except to the extent and for the purpose provided" in the exclusive agreement and that "[Desly] agrees that it is not a partner, broker, employee or franchise of [Spartak]." Exclusive Agreement §§ 2.1, 7.4, 8.3, 15.4.

Regardless whether Spartak can prove that Desly's sale of the accused products breached the exclusive agreement, it cites no current authority for the proposition that the sale of such goods in breach of contract alone establishes a right to recover profits because such breach, on its own, satisfies the standard for willfulness. In fact, the opposite appears true. *See e.g., El Greco Leather Prod. Co. v. Shoe World, Inc.*, 726 F. Supp. 25, 27-28 (E.D.N.Y. 1989) (describing that,

15

in a similar case to *El Greco*, "damages were denied against the seller of goods carrying the plaintiff's trademark where the manufacturer under contract to the plaintiff had violated the contract, and without notice, sold the seller the goods").

The willfulness inquiry lays bare the odd posture of this case. It creates the tension between liability and damages. On the one hand, Desly certainly acted wrongfully in registering and using a mark in violation of law and contract. At the same time, the evidence is overwhelming that the conduct caused Spartak no injury—no harm to reputation, no loss of profits, and that profits Desly gained could not have been Spartak's since they came from a product line that Spartak did not make. *See L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 182 (S.D.N.Y. 2009) and *L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 367 (S.D.N.Y. 2010) (finding holdover licensees liable for breach of contract and infringement under the Lanham Act but denying an award of profits where there was no head-to-head competition between the parties, defendants had not committed any affirmative acts designed to deliberately deceive any of the plaintiff's potential customers, it was unlikely that use of the mark "led to any substantial additional profits," and "an accounting would unjustly overcompensate for [p]laintiff's actual injury and create a windfall judgment at [d]efendants' expense").

In fact, willful infringement cases all seem centered on the plaintiff's proof of the defendant's intent to deceive somebody in the marketplace. *See Basch*, 968 F.2d at 1539 (recognizing that all three theories for awarding profits "share common ground" of "a finding of defendant's intentional deceptiveness"); *Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 282 (S.D.N.Y. 2007) (Plaintiff not entitled to profits when there was "absolutely no proof [in the record] that [defendant] attempted to deceive customers."). The fact that Desly placed its

16

own name and logo, front and center, on the accused products, in much larger and more prominent font than Spartak's, strongly suggests that it was trading on its own name and not any willful infringement of Spartak's mark. Tr. at 41; PTX 10. Stated otherwise, Desly's use of small font to associate its gingerbread cookie and dried bagel products with Spartak belied any intent to trick purchasers into believing that Spartak made and distributed them. The evidence, if anything, is compelling that the reference to Spartak on the accused products was a throwback to an era when the sale of these products was part of the hand in glove relationship between the two parties. Simply, the kind of willfulness necessary to support an award of profits as damages is not present.

   III.    Equitable Factors

Lastly, an analysis of the pertinent equitable factors also weighs against an award of profits to Spartak. Before awarding profits, courts must not only make a willfulness determination, but also consider other factors, "such as '(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) [the] availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the [wrongdoing]; (4) plaintiff's laches; and (5) plaintiff's unclean hands.'" *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 457 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (quoting *Basch*, 968 F.2d at 1540). Patently, "[a]lthough '[a] finding of bad faith, or willful deceptiveness, is necessary to warrant an accounting [of profits],' it 'may not be sufficient.'" *Malletier*, 500 F. Supp. 2d at 279 (citation omitted). The dictates of the Lanham Act are clear that an award of profits should be determined "according to the circumstances of the case." 15 U.S.C. § 1117. As developed at trial, these facts and circumstances strongly favor Desly.

Without doubt, in this tale of the two Spartaks, the laches factor weighs heavily in favor a

non-award. As the testimony of Marat Novikov and Alesia Samsonava, made clear, Spartak's then supervisory board knew that Desly planned to market the accused products bearing the name and logo before Desly began to market them. Tr. at 83-84. Pointedly, the general director of Spartak at the time, Alesia Samsonava testified that she knew that Desly was distributing such products in the United States. Tr. at 118, 120. Representatives from Spartak, moreover, actually visited Desly's Brooklyn operation upon more than one occasion, where the accused goods were openly available for viewing in Desly's showcase. Plus, the accused products were openly advertised on the internet marketplace. Conf. Tr. at 43-44; PTX 155. Though Desly never received explicit permission from Spartak to sell the accused products, absolutely no one from Spartak raised an objection. Tr. at 117-18. In fact, no one from Spartak ever communicated any objection to Desly or ever asked Desly to cease and desist from such sales. *Id.* at 118. Spartak's first and only objection, long after it had become aware of Desly's sale of the accused products, came when Spartak filed its counterclaim.

Relatedly, credited to the non-award side of the ledger is factor one: there is no proof that Desly's profits from the sale of the accused goods came as a result of Desly's use of the Spartak name on the cellophane-like packaging. For sure, they are not profits that Spartak would have received since it was not in that line of business. As to other available remedies, factor two, Desly's unauthorized registrations of the Spartak mark and logo have already been cancelled, *see Desly I* at *8, and Desly no longer sells the accused products in packaging that bears the Spartak mark, Tr. at 27. By all accounts, Desly dismantled the www.spartakusa.com website following this Court's liability determinations, and has manifested no intention of selling Spartak branded products in the future. Conf. Tr. at 44; Tr. at 49.[9]

---

[9] The more appropriate remedy of permanent injunction will afford Spartak all of the relief

Furthermore, and most unusually, Spartak was, the evidence strongly suggests, a willing beneficiary of Desly's side business. Desly's marketplace offering of the accused products was accompanied by a significant rise in Desly's sale of genuine Spartak products procured from Spartak. It may well go beyond the evidence to conclude that the side business caused the spike upward in the sale of Spartak's products, but it is compelling that the sale of the accused products did not cause the sale of genuine Spartak products to fall one penny.

The remaining factors, resolved either way, would add little to the equation and would not disturb the result. For example, Desly also sought to advance an "unclean hands" defense against Spartak's claim, but fails to carry the stiff burden required to make out such a defense. Such a defense would be of no moment, since, had it carried the burden, the determination on damages would not change. As a matter of equity, as well, Spartak is not entitled to an award of profits for Desly's sale of the accused products.

## Conclusion

For the reasons stated above, Spartak is not entitled to an award of profits from Desly's sale of the accused products. Desly is, however, permanently enjoined from using Spartak's name, marks, or logo in connection with the sale of any products.

Up to and including the entry of summary judgment, Spartak had prevailed on its claims arising, *inter alia*, under the Lanham Act and the exclusive agreement. Its claims failed thereafter. Within ten days of the date this Memorandum Decision and Order is docketed, Spartak shall notify the Court whether it intends to seek attorney's fees. No later than ten days

---

it needs to undo any wrong by Desly. *See Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011); *see also* Desly Br. at 11 ("Desly would not object to the issuance of a permanent injunction barring its sale of the [a]ccused [p]roducts.").

after the filing of any such notice of an intent to seek fees, the parties shall jointly propose a briefing schedule for that purpose.

If no such notice is given, within ten days of the date such notice was due, the parties shall jointly propose a judgment or separately propose judgments for settlement, in accordance with this Order and the Court's August 15, 2016 Memorandum and Order, Dkt. No. 104.

So Ordered.

Dated: Brooklyn, New York
October 28, 2017

/s/ USDJ ERIC N. VITALIANO
_____
ERIC N. VITALIANO
United States District Judge